OPINION OF THE COURT
Minna R. Buck, J.
By petition filed October 7, 1985, petitioner alleged that the above children were neglected by respondents, as evidenced by certain hospital reports of the child Lou’s medical condition. (An ex parte order placing the children in petitioner’s [Department of Social Services (DSS)] custody had been signed on Oct. 4, 1985.) A hearing was held on December 18, 1985, all parties and counsel being present throughout. Petitioner’s witnesses were Dr. B., a physician who cared for the child Lou during his hospitalization, and a police officer who interviewed both *139 respondents as part of the investigation which followed the report of suspected abuse/neglect to the Children’s Protective Service; the respondents each testified. Copies of hospital records pertaining to both children were received into evidence pursuant to CPLR 4518 without objection. After all parties rested, the court indicated that certain additional clarification from Dr. B. would be useful in making a determination; the specific area of inquiry was reviewed with all counsel, who stipulated to having the court put certain questions by telephone to the witness, with a record of the telephone conversation made by the court reporter. The court conducted this telephone conversation on December 19, 1985 and a transcript was then presented to all counsel prior to their presenting closing arguments the following day and made part of the record. Respondents then moved to strike the testimony of petitioner’s expert.
The relevant evidence may be summarized as follows:
1. The children named in the petition are under the age of 18, Lou having been born April 23, 1985 and Quita having been born May 2, 1984.
2. Respondents are the parents of both children. Although respondent mother lists her residence as different from that of respondent father, both respondents testified that she and one or both of the children frequently stay overnight at the father’s residence. Mother also testified that she stayed there most of the time in the three months preceding Lou’s admission to the hospital on October 1, 1985 and that Lou was in her care the entire week preceding that date except for several hours on September 30, 1985, when the infant was left in his father’s care.
3. Lou was brought to Crouse-Irving Hospital emergency room early on the morning of October 1 after his parents observed the baby was experiencing breathing difficulties and called an ambulance; he was later transferred to the Pediatric Intensive Care Unit at Upstate Medical Center where various tests were conducted and treatment administered.
Dr. B. was then on duty, in his capacity as a pediatric resident, and continued to treat and observe the child, in consultation with other staff pediatric specialists, for one week. Upon admission, the child was breathing with the aid of a "ventilator” but his vital signs were otherwise normal and no bruises or lacerations were observed. During the child’s second day of hospitalization, he experienced "seizures.” The *140 child was discharged from the hospital on October 14, 1985 to the custody of the petitioner.
4. Dr. B.’s diagnosis was that Lou exhibited signs of "shaken baby syndrome” — i.e., retinal hemorrhage, as well as presence of unexplained blood in the cranial cavity, without any evidence of any trauma or blow to the child. Other symptoms noted were the breathing difficulty, the subsequent seizures (i.e., spasticity, or clenching of the extremities) and unexplained blood in the spinal fluid. He testified that this had been his initial suspicion, but he came to his final diagnosis only after the administration of numerous tests (including CT scan, bone scan, blood clotting studies, urine/blood/spinal fluid cultures, electrolyte studies, electroencephalogram, chest X rays, blood count and check of arterial blood gases). He also examined records of the child’s hospitalization at birth and clinic examinations prior to October 1 and found nothing therein which would adequately explain the child’s condition on this latest admission. Based on the foregoing, other possible explanations of the child’s symptoms, such as internal bleeding in another part of the body, infection, cardiac problems or congenital brain damage were ruled out by the witness and, according to the hospital records, by other medical staff.
5. Each of the parents denied having shaken or struck the child, or having seen anyone else do so. Their only explanation or theory as to the cause of the child’s symptoms was either that the child had fallen a week earlier, from a chair to the carpeted floor, or that father had pounded the child on the back when he first observed the breathing difficulties.
Dr. B.’s testimony was that neither of these theories was consistent with the clinical evidence: assuming the baby had fallen to the floor, there was no bruise or any abnormality of the skull which would suggest a blow to the head severe enough to cause the child’s symptoms.
He also ruled out any pounding to the child’s back as causing the problem, based on the following explanation: "Shaken baby syndrome” is a result of an infant being held around the chest and shaken back and forth; this creates a "whiplash” effect because an infant’s head is disproportionately large in relation to the rest of its body and its muscular control is insufficiently developed to allow the infant to hold up its head. These factors would not operate in the case of a child who was simply pounded on the back.
6. Assuming an infant to have been shaken severely enough *141 to cause the signs initially noted in this case, the unrebutted testimony was that these signs might present themselves at any time from within several hours of the incident to four-five days later, but would probably be manifest within two or three days of such shaking. By the respondents’ own testimony, one or both of them were the only people caring for Lou during the entire period in question. The child was admitted to the hospital on October 1, 1985. Respondent mother had arrived at respondent father’s apartment shortly after midnight on September 30, 1985 with the two children. During the five-day period prior to that, she and the child had stayed with her sister. Although mother testified that on occasions in the past her sister had baby-sat for Lou, there is nothing on this record to show that the sister cared for the child in mother’s absence during this particular five-day period.
7. Subsequent to the initial effects and/or signs of "shaken baby syndrome,” there may be additional, longer term effects, such as cerebral palsy or other neurological disorder.
Clearly, petitioner’s case rests on the testimony of Dr. B. Whether or not his testimony should be allowed to stand or, if included whether or not it is sufficient to sustain the petition, depends on the applicability of the general rules on expert testimony to the facts in this case. As stated in McCormick, Evidence § 13 (3d ed 1984): "To warrant the use of expert testimony two general elements are required. First * * * the subject of inference must be so distinctively related to some science * * * as to be beyond the ken of laymen * * * Second, the witness must have sufficient skill, knowledge, or experience in or related to the pertinent field * * * that his opinion or inference will probably aid the trier in the search for truth”. Many courts, including those in New York, have added the further rule that the expert testimony is not admissible without a showing of "general acceptance of the principle or technique in the scientific community” (id., §203; Frye v United States, 293 F 1013; People v Torres, 128 Misc 2d 129; People v Leone, 25 NY2d 511; cf. People v Hughes, 59 NY2d 523, 537).
In the instant case, it is self-evident that the question of causality of the child’s condition is a matter of medical and scientific expertise; the child had stopped breathing, required immediate medical and surgical intervention, and the medical diagnosis required a variety of sophisticated tests during more than one week’s hospitalization.
*142 The expertise of the petitioner’s medical witness was challenged by respondents on the grounds that his knowledge of "shaken baby syndrome” prior to the instant case was derived solely from reading and attending lectures, and that this was the first such case he had seen or treated. The acceptance of a witness’ expertise is a matter of discretion for the court (McCormick, op. cit. § 13; Richardson, Evidence § 368 [10th ed]; People v Henson, 33 NY2d 63) and the opinion of a licensed physician based on either study or experience alone may be admissible (Richardson, op. cit.). On this record, the court now rules that Dr. B.’s testimony should not be stricken.
Whether "shaken baby syndrome” is a condition whose signs and causality are "generally accepted” in the medical field is a question which has not heretofore been addressed in the published opinions of courts in New York and no direct proof, other than Dr. B.’s testimony, was offered on this point during this proceeding. Nevertheless, this court now finds that "shaken baby syndrome” (sometimes denoted as "shaken infant syndrome” or "shaken child syndrome,” as indicated below) is a generally recognized medical condition, and "the state of the pertinent art or scientific knowledge [is] sufficiently developed to permit a reasonable opinion to be asserted” (People v Torres, supra, at p 134). For example, Child Abuse and Neglect Litigation: A Manual for Judges (US Dept of Health & Human Servs, Pub No. 80-30268, at 13 [Mar. 1981]) cites the following:
"Extracts from Interdisciplinary Glossary on Child Abuse & Neglect * * * DHEW Publication No. 78-30137 * * *
" 'Whiplash-Shaken Infant Syndrome: Injury to an infant or child that results from that child having been shaken, usually as a misguided means of discipline. The most common symptoms, which can be inflicted by seemingly harmless shakings, are bleeding and/or detached retinas and other bleeding inside the head. Repeated instances of shaking and resultant injuries may eventually cause mental and developmental disabilities’ ”.
More detailed medical descriptions of the signs and causality of shaken child/infant syndrome, together with references to research findings on which they are based and descriptions of the use of craniocerebral computed tomography (CT scans) in diagnosis can be found in Merten & Osborne, Craniocerebral Trauma in the Child Abuse Syndrome (12 Pediatric Annuals 882 [1983]) and Klein, Central Nervous System Injuries (Child Abuse & Neglect ch 5 [NY 1981]).
*143 Only two cases outside New York have been found which deal with shaken child/infant syndrome, People v Kailey (662 P2d 168 [Col 1983]) and State v Schneider (Ct App, Lucas County, Ohio, No. L-84-214 [Dec. 1984]). Each of these cases upheld lower court criminal convictions based on injuries to children described as shaken infant syndrome. What is relevant for our purposes here is that in each case the purported errors at trial involved issues of criminal intent or admissibility of past acts, but the scientific acceptability of what was described on the record as shaken infant syndrome was apparently taken for granted, since no questions were raised by the parties or even discussed by the respective courts.
The evidence in the instant case also supports the conclusion that shaken child/infant syndrome is generally accepted in the medical community. The record of Lou’s hospitalization is replete with references to shaken baby syndrome (without quotation marks), initially by Dr. B. and subsequently either reiterated or accepted without comment by six other attending physicians who also signed the hospital record.
Moreover, the hospital records buttress Dr. B.’s diagnosis that shaken baby syndrome was present in this case. They contain the written confirmation, dated October 1, 1985, by the attending physician (Dr. B.’s supervisor) of Dr. B.’s preliminary diagnosis of retinal hemorrhage, "highly suspect for shaken baby syndrome”; the report by the neuroradiologist who analyzed the CT scan, "findings most consistent with shaken baby syndrome”; and the discharge summary, again signed by the same supervising physician, "Lou’s problems were felt to be secondary to shaken baby syndrome.”
The foregoing findings compel the conclusion that the child Lou must be adjudicated neglected by respondents. The statute clearly states that "proof * * * of the condition of a child of such a nature as would ordinarily not * * * exist except by reason of the acts or omissions of the parent[s] * * * shall be prima facie evidence of child abuse or neglect” (Family Ct Act § 1046 [a] [ii]). The credible evidence is that Lou suffered "shaken child syndrome,” a condition which has the potentiality of long-range damage to the child’s physical and mental development. Common experience adds that a six-month-old infant could not have shaken himself to such a degree. No credible evidence was offered by the parents to support any other satisfactory explanation of the child’s condition (Matter of Cynthia V., 94 AD2d 773).
*144 In the absence of direct evidence that either or both of the respondents actually administered the shaking, the court declines to make a finding of abuse merely on the basis of the statutory presumption, but does find that Lou is a neglected child, in that his physical or mental condition has been impaired as a result of respondents’ failure to exercise a minimum degree of care in providing proper supervision, by either inflicting, or allowing to be inflicted, harm to the child (Matter of Tashyne L., 53 AD2d 629; Matter of Tonita R., 74 AD2d 830).
The court further finds that the child Quita is a neglected child in that her physical, mental or emotional condition is in danger of becoming impaired as a result of her parents having neglected Lou as herein described.
The Probation Department is hereby directed to conduct a social investigation to be submitted to the court upon the next appearance, which is now scheduled for March 13, 1986 at 9:30 a.m. in Part V.