STATE OF CONNECTICUT *v.* THEODORE McCLARY
(13036)

HEALEY, SHEA, CALLAHAN, COVELLO and SANTANIELLO, Js.

Argued December 10, 1987—decision released April 26, 1988

*Louis S. Avitabile,* special public defender, with whom were *Joshua R. Kricker,* special public defender, and, on the brief, *Denise Dishongh,* special public defender, for the appellant (defendant).

*Marcia B. Smith,* assistant state's attorney, with whom, on the brief, was *John A. Connelly,* state's attorney, for the appellee (state).

CALLAHAN, J. The defendant was charged in a substitute information with one count of risk of injury to a child in violation of General Statutes § 53-21[1] and one count of assault in the first degree in violation of General Statutes § 53a-59. Both counts arose out of the same incident that allegedly occurred on February 11, 1985, in Waterbury. The charges were tried to the court and the defendant was found not guilty of assault in

---

[1] "[General Statutes] Sec. 53-21. INJURY OR RISK OF INJURY TO, OR IMPAIRING MORALS OF, CHILDREN. Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

the first degree but guilty of risk of injury to a child. He was sentenced by the trial court to serve a term of imprisonment of seven years.

The information against the defendant was brought as a result of an investigation into the cause of a severe brain injury suffered by Jennifer Lovette, the six month old daughter of the defendant and Janice Lovette, with whom the defendant intermittently resided. The injury was devastating and resulted in irreversible dysfunction of the brain and neurological systems of the child. At trial the state offered evidence to prove that the injury was caused by a severe, violent shaking administered while the child was in the temporary care of the defendant. The defendant has raised several issues on appeal that may be encapsulated into the single issue of whether the state presented sufficient, reliable evidence to enable the trial court to find the defendant guilty beyond a reasonable doubt. The defendant's principal claim is that the perceived reliance of the trial court on the so-called "shaken baby syndrome" to prove the mode of the injury to the child and the defendant's culpability in inflicting that injury was erroneous.

The trial court could reasonably have found the following facts and credited the following opinions. On the morning of February 11, 1985, the child, Jennifer, ate breakfast, played with her stuffed animals, was given a bath, and then was dressed by her mother. During that period of time the baby appeared normal and alert. Later, in the early afternoon, the child's mother, when preparing to leave her apartment for a short time, asked the defendant to put the baby to sleep. At that time the defendant was seated on the couch playing with the child. When the mother returned to the apartment some fifteen minutes later, the baby was asleep on the couch. At that time the mother asked the defendant to put the infant into her crib. When the defendant picked the baby up to do so, the baby's arm was

limp and she was moaning. After the baby was placed in her crib, the child's mother again left her apartment, leaving the infant with the defendant. While in her crib the baby continued to moan in her sleep. A short time later, while a friend of the mother was visiting at the apartment, the defendant noticed that the baby was rolling her eyes and foaming at the mouth. Leaving the mother's friend with the baby, the defendant ran to seek the assistance of Janice Lovette's father, Theodus Lovette, who lived in the area. The elder Lovette returned to his daughter's apartment and drove the defendant and the baby to the Waterbury Hospital emergency room where they arrived at approximately 4:45 p.m. Theodus Lovette testified that at the time the defendant entered his automobile with the baby, he observed that something was wrong. He testified that the baby appeared as though she had "collapsed or something."

The baby was examined first at Waterbury Hospital by an emergency room physician and then, between 6 and 7 p.m., by Stuart Gardner, a pediatrician. She was thereafter examined by Victoriano Baldovi, the baby's regular pediatrician, who had treated her for various ailments and dietary problems since her premature birth six months earlier. The baby was also later examined by Roger Bobowick, a neurologist. All three physicians diagnosed the baby as having subarachnoid hemorrhaging[2] and extensive retinal hemorrhaging.

Gardner testified that in his mind there was no doubt that the injury to the baby was caused by a violent shaking, probably within the previous twelve hours. Baldovi testified that the most probable cause of the trauma

---

[2] A subarachnoid hemorrhage is a bleeding into the space between the arachnoid and the pia mater. The arachnoid is the middle of the three membranes which cover the brain and spinal cord; the pia mater is the innermost of the three membranes. 3 Schmidt, Attorney's Dictionary of Medicine (1988).

to the child was something violent, such as "a severe shaking, like shaking of the baby." Baldovi also testified that none of the problems for which he had previously treated the infant would account for her condition that evening. Bobowick examined the child very briefly and in his testimony for the defense did not venture any opinion as to the cause of the child's condition.

In view of the serious, life-threatening nature of the baby's injuries, a decision was made to transfer her from the Waterbury Hospital to Hartford Hospital where more sophisticated diagnostic equipment and pediatric facilities were available. Consequently, in the early morning hours of February 12, the baby was transported to the Hartford Hospital pediatric care unit where, between 3 and 4 a.m., she was examined by Carolyn Riegle, a pediatrician and a specialist in pediatric intensive care. In her report, Riegle noted a bulging fontanel[3] in the child's head caused by bleeding and also noted hemorrhaging of the eyes. She concluded that "the combination of retinal hemorrhage and subarachnoid blood is indicative of a shaking injury."

The child was also seen in Hartford Hospital on February 12 by Carol Leicher, a pediatric neurologist. Leicher observed that the baby had a cortical fist and a spontaneous extension of the left toe which were indicative of a brain injury affecting the motor system. She also observed multiple hemorrhages of the eyes which were indicative of trauma "most likely of the whiplash or shaken baby type." Leicher also noted bleeding in the subarachnoid space.

At trial Reigle testified that the symptoms she noted in her examination were secondary to a shaking injury and could not have been caused by a seizure or convul-

---

[3] A fontanel is a region in the skull of an infant which is not yet bone, but consists of membrane which later becomes bone. 2 Schmidt, Attorney's Dictionary of Medicine (1988).

sion, natural causes or any medical problems which the child previously possessed. She opined that the combination of retinal and subarachnoid hemorrhages that she observed in the infant could only have been caused by a shaking injury which occurred within twenty-four hours before the child was admitted to Waterbury Hospital on February 11. She also stated that the child would not have been normally awake and alert after the infliction of such an injury and that the change should have been noticeable to anyone familiar with the child.

Leicher testified at the trial that something acute happened to the child and that her injuries could not have come from natural causes or anything noted in her previous medical history. She also testified that there was no evidence of exterior trauma to the child's face or head and that the traumatic brain injury and the symptoms she noted were consistent with, and could only have resulted from, a severe shaking. Further, Leicher testified that, in her opinion, while the person responsible for the child's injuries might not have known they were producing brain damage by the shaking, they had to know they were causing discomfort to the child.

Another physician, Paul Mitchell, a pediatric ophthalmologist, saw Jennifer for the first time on February 15. At that time, he testified, he noted fresh hemorrhages in the retina of her eyes which resulted from trauma within or to the brain. He stated that the extent of the hemorrhages which he saw usually occur after a severe shaking of a child and are called "whiplash shaking syndrome." He had no doubt that the child's injuries were caused by shaking. He also testified that the injuries he observed could not have been the result of a casual, playful shaking but would require a vigorous, violent shaking. He testified further that, in his opinion, after the infliction of such an injury a

child would not appear alert and playful and would not have taken food normally. He stated that Jennifer is now totally blind and will never recover her vision.

Kurt Myers, a pediatrician who first saw Jennifer on March 29, 1985, and was her treating pediatrician at the time of trial, also testified. He stated that Jennifer was a severely, neurologically disabled child who was blind and was required to be fed by a gastrostomy tube. Myers indicated there was very little hope for improvement and that the child in all probability would always be bedridden. He testified that the child had evidence of retinal and subarachnoid hemorrhaging and severe cerebral bruises which, in his opinion, could not have resulted from natural causes, a fall or anything in the baby's medical history. He stated that what he observed "would be a shaking kind of injury."

The defendant took the stand in his own defense and testified that he never played violently with the baby nor shook her violently. He denied categorically that he had done anything on February 11 to injure the baby. Two acquaintances of the defendant also testified that the defendant was a "peaceful person" with children. Janice Lovette testified that she had never seen the defendant violent or upset with her children.[4]

At the conclusion of the trial the defendant filed a motion for a judgment of acquittal, a motion in arrest of judgment and a motion for a new trial, all of which were denied. This appeal followed.

The defendant first argues that the evidence was insufficient to allow the trial court to find that there was a shaking of the child with the requisite "general intent or knowledge that the act was likely to impair the health of a minor." The defendant misperceives the nature of the general intent required to convict him

---

[4] Janice Lovette had another daughter by the defendant.

of doing an act likely to impair the health of a child, the provision of § 53-21 of which he was found guilty. It was not necessary for a conviction under that provision for the trial court to find *any* intent to injure the child or impair its health. All that was required was the general intent on the part of the defendant to perform the act which resulted in the injury, that is, that the bodily movement which resulted in the injury was volitional. *State* v. *Pierson,* 201 Conn. 211, 216–17, 514 A.2d 724 (1986); *State* v. *Martin,* 189 Conn. 1, 12–13, 454 A.2d 256, cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983); *State* v. *Perez,* 181 Conn. 299, 315–16, 435 A.2d 334 (1980); *State* v. *Dennis,* 150 Conn. 245, 250, 188 A.2d 65 (1963).

" 'When the elements of a crime consist of a description of a particular act and a mental element not specific in nature, the only issue is whether the defendant intended to do the proscribed act. If he did so intend, he has the requisite general intent for culpability. When the elements of a crime include a defendant's intent to achieve some result additional to the act, the additional language distinguishes the crime from those of general intent and makes it one requiring a specific intent.' " *State* v. *Shine,* 193 Conn. 632, 638, 479 A.2d 218 (1984), quoting *State* v. *Bitting,* 162 Conn. 1, 5, 291 A.2d 240 (1971); *State* v. *Pascucci,* 164 Conn. 69, 74, 316 A.2d 750 (1972); *State* v. *Husser,* 161 Conn. 513, 515, 290 A.2d 336 (1971); 21 Am. Jur. 2d, Criminal Law §§ 89 through 91. Here there was no language in the portion of the statute under which the defendant was convicted that required, as an element of the crime, the intent by the defendant to achieve some result additional to the act. We conclude that there is no merit to the defendant's initial claim.

The defendant next claims that the only purpose of medical testimony is to "explain the possible meaning

of facts already in existence to the trier of fact and not to create facts that do not already exist in the case." By this, the defendant appears to argue that the opinions elicited from the physician witnesses could not be used to establish that the victim's injuries were caused by a violent shaking. We disagree. On the foundation laid as to the expertise of the physician witnesses, the trial court did not err in concluding that they were competent to express an opinion as to the cause of the baby's injuries. "It has long been our rule that 'the qualification of an expert witness is within the discretion of the trial court and its decision will not be disturbed on appeal unless that discretion is abused . . . .' *State* v. *Wilson,* 180 Conn. 481, 489–90, 429 A.2d 931 (1980); *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973); *Coffin* v. *Laskau,* 89 Conn. 325, 329, 94 A. 370 (1915)." *State* v. *Ortiz,* 198 Conn. 220, 228, 502 A.2d 400 (1985). Further, "[a]n expert medical witness may give his opinion as to the means used to inflict a particular injury, based on his deduction from the appearance of the injury itself." *People* v. *Jackson,* 18 Cal. App. 3d 504, 507, 95 Cal. Rptr. 919 (1971). "Such testimony is not accusatory, but only indicates the cause of [the injury]." *State* v. *Tanner,* 675 P.2d 539, 542 (Utah 1983). Also, "evidence of the cause . . . or more broadly, of the medical effect upon the human system of the infliction of injuries, is generally not within the sphere of the common knowledge of a lay witness" and requires expert testimony. *Collette* v. *Collette,* 177 Conn. 465, 471, 418 A.2d 891 (1979); *Sickmund* v. *Connecticut Co.,* 122 Conn. 375, 379, 189 A.2d 876 (1937). The expert opinion evidence did not "create facts"; rather, it was correctly and necessarily admitted to explain the full extent and cause of the victim's obvious injuries. *State* v. *Tanner,* supra, 543. There is no merit to this claim.

Next, citing *Moore* v. *McNamara,* 201 Conn. 16, 32–33, 513 A.2d 660 (1986),[5] the defendant contends that "the opinion of each doctor that the injuries resulted from a violent act by someone who had the baby in his or her custody within 12–24 hours before she was brought to the hospital, and must have known that he was hurting the victim *assumes* the existence of an act and the mental state of the alleged perpetrator." (Emphasis added.) He claims, therefore, that the trial court erred by finding "the existence of the act and the requisite mental state of knowledge solely from the opinion of the doctors." We find this argument of the defendant difficult to understand. It is manifest that the experts merely stated their medical opinions as to how and approximately when the injury to the child occurred. The opinions expressed by the medical witnesses were well within the ambit of their field of expertise. A medical expert who is qualified to render an opinion as to the cause of an injury may do so as long as the opinion is stated with a reasonable degree of medical probability. *Healy* v. *White,* 173 Conn. 438, 443–46, 378 A.2d 540 (1977); 31 Am. Jur. 2d, Expert and Opinion Evidence § 44. That is all that the physicians in this case appear to have done. Although none of the experts who had expressed an opinion seemed to have had any doubt that the victim's injuries were caused by a severe shaking, it does not appear anywhere in the record that they "assumed" any act or mental state of the defendant.

---

[5] In *Moore* v. *McNamara,* 201 Conn. 16, 32–33, 513 A.2d 660 (1986), this court expressed concern with the possibility that the trial court may have used the results of human leukocyte antigen and blood grouping tests to find the fact of sexual intercourse between the putative father and the mother of the child in question. We noted that this would be incorrect because the testing procedure, in the equation used in arriving at its result, already assumed an act of sexual intercourse between the parties during the period of conception.

Moreover, the only medical testimony remotely related to state of mind was that of Leicher, who testified that anyone who shook the baby to the extent indicated by the injuries would have had to have known that they were causing the child discomfort. There is no indication, however, that she "assumed" the shaking of the child or the mental state of whoever shook her. Rather she was expressing her opinion as to the cause of the victim's injury and the force required to inflict it. The trial court did not err in allowing and, if it saw fit, crediting that opinion. *Healy* v. *White,* supra, 445; *People* v. *Jackson,* supra, 507; *State* v. *Tanner,* supra, 543.

The defendant also claims that the trial court erred because it relied "solely" on the medical evidence to find the existence of the "criminal act" and the "mental state necessary" to constitute the elements of the crime of risk of injury to a child. If by "criminal act" the defendant means the cause of the injury to the child, we agree that it was established solely by expert medical testimony. We do not see that as error, however. The causation of an injury such as that suffered by the infant in this case is an esoteric subject which obviously would require expert medical testimony to prove. *Jaffe* v. *State Department of Health,* 135 Conn. 339, 349, 64 A.2d 330 (1949); *Sickmund* v. *Connecticut Co.,* supra, 379. There is no rule of law or evidence which prevents the trier of the facts from utilizing expert medical testimony to establish the cause of an injury. Cf. *Budney* v. *Zalot,* 168 Conn. 388, 389, 362 A.2d 861 (1975); *Boland* v. *Vanderbilt,* 140 Conn. 520, 524, 102 A.2d 362 (1953); *People* v. *Jackson,* supra.

If by "criminal act" the defendant means the culpability of the defendant for the injury to the child, we disagree that it was established "solely" by medical evidence. There was significant testimony by the child's

mother concerning the alert, normal condition of the baby prior to being left with the defendant. The child's mother and the defendant also testified that the defendant was the only person with access to the child at the critical time she apparently suffered her catastrophic injury. Though the trial court found, from the medical testimony, that a severe shaking caused the baby's injuries, that testimony would have been for naught without the lay testimony concerning the prior condition of the child and the defendant's exclusive access to the child during what, the trial court could have found, was the crucial period when she suffered her injuries. See *State* v. *Tucker,* 181 Conn. 406, 418–19, 435 A.2d 986 (1980).

The defendant further argues that the trial court improperly relied solely upon medical testimony to establish "the mental state required" for the commission of the crime, apparently again referring to the medical testimony elicited which indicated that the person who caused the injury to the child would have had to have known he or she was causing the child discomfort. Even if that testimony could be construed as referring to state of mind, such knowledge or mental state is not an element of the crime required to establish guilt. For a conviction the trial court had to find proven beyond a reasonable doubt only that the defendant, by a volitional act, shook the child and caused the injury. There was ample medical testimony, other than that just referred to, which established the cause of injury as a vigorous or violent shaking and the trial court could have relied on that evidence to find that the shaking was done intentionally and not accidentally. We find no merit to this claim of the defendant.

The defendant next argues that the diagnosis of the victim's injuries in this case as "shaken baby syndrome," because of the constellation of symptoms she exhibited, is not a medically accepted diagnosis that

rules out accidental injuries or natural causes. We assume his claim is that the trial court should not have relied on the expert medical testimony as to this diagnosis in concluding that the victim's injuries were caused by a violent shaking. We disagree.

A diagnosis of the victim's injuries and a determination of their cause from simply a knowledge of her symptoms and the results of the various tests and examinations she underwent is manifestly beyond the ken of the average trier of fact, be it judge or jury. See *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973); *Van Detti* v. *Parsons Bros., Inc.,* 146 Conn. 282, 286–87, 150 A.2d 200 (1959). The trial court of necessity therefore required expert medical testimony for a resolution of the criminal charges against the defendant. *Jaffe* v. *State Department of Health,* supra, 349; *Sickmund* v. *Connecticut Co.,* supra, 379. "[E]xpert testimony may be admitted if the witness has a special skill or knowledge, beyond the ken of the [average trier of fact], that as properly applied, would be helpful to the determination of an ultimate issue." *Siladi* v. *McNamara,* supra, 513; *State* v. *Esposito,* 192 Conn. 166, 175, 471 A.2d 949 (1984); *Slimak* v. *Foster,* 106 Conn. 366, 368–69, 138 A. 153 (1927); *State* v. *Dumlao,* 3 Conn. App. 607, 610, 491 A.2d 404 (1985). Expert medical testimony delivered with the requisite degree of medical probability is sufficient to remove the issue from the realm of speculation and present an issue to be determined by the trier of fact. *Witkowski* v. *Goldberg,* 115 Conn. 693, 696, 163 A. 413 (1932). That there are other possible causes of the injury goes to the weight of the opinion, not to its admissibility.

The expert witnesses in this case testified that the injuries Jennifer suffered were characteristic of those suffered by a severely shaken baby and diagnosed her as suffering from "shaken baby syndrome." As an adjunct to that diagnosis, the expert witnesses ruled

out the possibility of her injuries having been suffered by accidental means or from natural causes. The salient question then is whether "shaken baby syndrome," i.e., the constellation of symptoms that led to the opinion of the physicians that Jennifer's injuries were caused by a severe shaking, is a "generally accepted" diagnosis in the medical field. *Frye* v. *United States,* 293 F. 1013, 1014 (D.C. App. 1923); *State* v. *Miller,* 202 Conn. 463, 484, 522 A.2d 249 (1987). We conclude that it is.

"[T]his court now finds that 'shaken baby syndrome' (sometimes denoted as 'shaken infant syndrome' or 'shaken child syndrome'. . .) is a generally recognized medical condition, and 'the state of the pertinent art or scientific knowledge [is] sufficiently developed to permit a reasonable opinion to be asserted.' *(People* v. *Torres,* [128 Misc. 2d 129, 134, 488 N.Y.S.2d 358 (1985)])." *Matter of Lou R.,* 131 Misc. 2d 138, 142, 499 N.Y.S.2d 846 (1986). "[T]he theory of cause of death here, violent shaking, resulting in subdural hematoma, has been accepted as legally sufficient in other cases." *State* v. *Evans,* 74 N.C. App. 31, 36, 327 S.E.2d 638 (1985); see also *Dabbs* v. *State,* 518 So. 2d 825 (Ala. App. 1987); *People* v. *Kailey,* 662 P.2d 168, 170 (Colo. 1983); *State* v. *Ostlund,* 416 N.W.2d 755, 760–61 (Minn. App. 1987); *State* v. *Munici,* Slip. Op. 1987 WL 20206, Ohio App. Cuyahoga County, No. 52579 (Nov. 19, 1987); *State* v. *Schneider,* Slip. Op. 1984 WL 3719, Ohio App. Lucas County CA No. 6-84-214 (Dec. 21, 1984).

An excellent illustration of the degree of acceptance is the testimony in this particular case. Six expert medical witnesses testified—a specialist in pediatric intensive care, a pediatric neurologist, a pediatric ophthalmologist, and three pediatricians—and all accepted the theory and testified as to the symptoms and causes of "shaken baby syndrome." Not one witness testified that it was not a medically accepted diagnosis.

The defendant attempts to equate the diagnosis here with that of the "battered child syndrome"[6] and argues there is insufficient indication that Jennifer was a battered child to allow the court to draw any inferences from her injuries, as may be done in the case of a child diagnosed as a "battered child." We agree that Jennifer does not fit the classic profile of a battered child.

In the instant case, however, the "battered child syndrome" is not an issue. In this case each conclusion or inference indicating the defendant's guilt was independently supported by evidence. The nature and extent of Jennifer's injuries and the expert medical testimony elicited allowed the trial court to infer, and to conclude, that her injuries were not caused accidentally and were not the result of natural causes but rather resulted from a severe intentional shaking. The further fact that the evidence clearly showed that the defendant was alone with and had the sole care of the infant during the critical time the injury was apparently inflicted raised an inference and allowed the court to find that he administered the shaking. See State v. Tucker, supra, 418–19; State v. Campbell, 316 N.C. 168, 173–74, 340 S.E.2d 474 (1987); State v. Evans, supra, 34. There was no inference drawn as to the identity of the culpable party and no inference drawn that the injuries to the child were not suffered accidentally simply from the age, number of injuries or the neglected condition of the child as may be permissible in the case where the diagnosis of "battered child syndrome" is applicable.[7]

---

[6] "There are several elements that are the criteria for the 'battered child syndrome.' They are (1) the child is usually under three years of age; (2) there is evidence of bone injury at different times; (3) there are subdural hemotomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6) there is evidence of neglect." People v. Jackson, 18 Cal. App. 3d 504, 506, 95 Cal. Rptr. 919 (1972); People v. Durand, 465 A.2d 762, 767 (R.I. 1983).

[7] The diagnosis of "battered child syndrome" allows the trier of fact to infer that a child's injuries were not accidentally inflicted and, if the child

The defendant next claims that even if the "shaken baby syndrome" is a generally accepted medical diagnosis, it cannot be utilized in a criminal trial to prove that a violent, nonaccidental shaking occurred. If, by this contention, the defendant means that the medical experts could not testify as to the cause of the child's injury and the amount and type of force it would require to cause such an injury, or that the trial court could not credit such testimony, or draw reasonable inferences from it, we disagree. If, by this contention, the defendant means that the diagnosis of "shaken baby syndrome," standing by itself, would be insufficient as definitive proof of the identity of the defendant as the person criminally responsible for the baby's condition, we agree. The trial court, however, did not rely solely on the medical testimony concerning the "shaken baby syndrome" to prove that the defendant was responsible, but rather correlated that testimony with the other circumstantial evidence elicited during the course of the trial and determined that it was sufficient to prove the defendant's guilt beyond a reasonable doubt. It is evident from the trial court's statement when denying the defendant's posttrial motions that this is what occurred. There the trial court said, "The only opinions ever given by any of the doctors that I gave any weight to was an opinion as to how the baby was injured without naming any individual or accusing anybody of doing the harming of the baby." The defendant's responsibility, therefore, was obviously determined by the trial court from the totality of the circumstantial evidence, not simply the medical testimony. This is as it should be. Circumstantial evidence may be used to establish the elements of a crime; *State* v. *Dumlao,* supra, 613; and " '[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes

---

was in the sole custody of the parents, that the parents are culpable. *State* v. *Dumlao,* 3 Conn. App. 607, 623, 491 A.2d 404 (1985); *State* v. *Henson,* 33 N.Y.2d 63, 74, 304 N.E.2d 358, 349 N.Y.S.2d 657 (1973).

guilt in a case involving substantial circumstantial evidence.' *State* v. *Perez,* [183 Conn. 225, 227, 439 A.2d 305 (1981)] . . . ." *State* v. *Braxton,* 196 Conn. 685, 691, 495 A.2d 273 (1985). We find no merit to this claim of the defendant.

The defendant's final claim, which is a compendium of his previous claims, is that there was insufficient evidence to find, and the trial court erred when it found, the criminal culpability of the defendant, i.e., that he committed the act and had the requisite mental state for culpability. We disagree.

Although we believe this ground has been covered previously, in summary, we reiterate that while it is obviously true that the trial court found the cause of the injury, the approximate time parameters in which it occurred, and its symptoms and effects from the medical testimony, it found the culpability of the defendant, for which no particular state of mind was required, from the totality of the circumstantial evidence. In claiming that the trial court could not have found as it did, the defendant is, in effect, asking that we retry the case. This we cannot do. *State* v. *Stepney,* 191 Conn. 233, 235, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984); *Kaplan* v. *Kaplan,* 186 Conn. 387, 391, 441 A.2d 629 (1982); *State* v. *Coulombe,* 143 Conn. 604, 609, 124 A.2d 518 (1956). We can only review the evidence and construe it as favorably as possible with a view toward sustaining the conviction, and then determine whether, in light of the evidence, the trier of fact could reasonably have reached the conclusion it did reach. *State* v. *Rossier,* 175 Conn. 204, 207, 397 A.2d 110 (1978). If any rational trier of the fact could have reached the conclusion reached by the trial court its verdict must be sustained. *State* v. *Miller,* supra, 489. We cannot say that the trial

court could not have found the defendant guilty beyond a reasonable doubt.

There is no error.

In this opinion the other justices concurred.