884 F.2d 580
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Greg Lee SMITH, Petitioner-Appellant,
v.
Mike MONTGOMERY, Director Marion County Adjustment Center,
St. Mary, Kentucky, Respondent-Appellee.
 No. 88-5346.
 United States Court of Appeals, Sixth Circuit.
 Aug. 25, 1989.
 
 Before DAVID A. NELSON, Circuit Judge, and JOHN W. PECK and LIVELY, Senior Circuit Judges.
 PER CURIAM.
 
 
 1
 This habeas corpus case presents, in an unusual setting, the familiar question whether the evidence offered at a criminal trial was sufficient to enable a rational jury to return a verdict of guilty. The petitioner was convicted in a Kentucky court of the reckless homicide of a one year old child who had been left in his care. Some of the medical signs were consistent with "shaken child syndrome." Like the district court, we believe that there was sufficient evidence to pass constitutional muster under the rationality test of Jackson v. Virginia, 443 U.S. 307 (1979); the denial of the writ will therefore be affirmed.
 
 
 2
 * Christopher Masden, the son of Betty Masden, died on September 18, 1983. He was approximately one year old at the time. The petitioner, Greg Lee Smith, had been living with Ms. Masden and Christopher for some four months before Christopher's death. The testimony of both Mr. Smith and Ms. Madsen indicated that Mr. Smith had a good relationship with the child. Mr. Smith testified that he planned to adopt Christopher following his planned marriage to Ms. Masden. Ms. Masden testified that Mr. Smith assisted her with feeding the baby, changing his diapers, and bathing and dressing him, and she said that Smith and Christopher got along "like father and son."
 
 
 3
 On the afternoon of September 16, 1983, Ms. Masden left her apartment to go shopping. Mr. Smith remained behind to keep an eye on the child. When Ms. Masden returned home, she found Mr. Smith waiting for her at the bottom of the stairs with Christopher in his arms. Smith told her that the baby had fallen, and he had her drive them to the hospital.
 
 
 4
 Christopher was taken to the hospital's emergency room, and shortly thereafter he was moved to the Kosair Children's Hospital in Louisville, Kentucky. Over the night, his condition worsened; he became comatose and stopped showing normal reflexes such as coughing and blinking. He died two days later.
 
 
 5
 Following Christopher's death, Mr. Smith was indicted for wanton murder pursuant to KRS 507.020. The indictment charged that Smith "[w]antonly struck Christopher Masden in such manner as to create a grave risk of death to said child and did in fact cause the death of said child ..." He was tried before a jury in the Taylor County Circuit Court in Campbellsville, Kentucky.
 
 
 6
 At the trial, the Commonwealth's case rested in large part on the testimony of Dr. George Nichols, a forensic pathologist. Dr. Nichols first examined the body of Christopher on the morning after his death. The examination revealed minimal exterior trauma--a small contusion inside the upper lip, and "a series of generally insignificant contusions or bruises" on the child's back.
 
 
 7
 Dr. Nichols found only "limited trauma to the internal structures of the body." He did, however, observe a blood clot in front of the vertebral column in the base of the neck. There was no trauma to the spinal column, nor was the neck broken. The most prominent internal trauma were eleven contusions on the scalp, extending from the right occipital area to the frontal area. These eleven contusions were all maroon-colored, and were in the same stage of healing. They were not distributed in any identifiable pattern.
 
 
 8
 Dr. Nichols also found an abnormal collection of blood in the subdural space on both sides of the child's head. The child's brain had experienced severe swelling, causing compression of the brain against the inside of the skull and pressure on the brain itself. The doctor ruled out any congenital or acquired abnormality as a possible cause. The immediate cause of death was said to be massive cerebral edema, "meaning that the brain had swollen to such an extent that it was pressing against the inside of the skull to such an extent that ... blood ... literally could not get into the skull."
 
 
 9
 Dr. Nichols' opinion was that the baby's death was due to blunt cranial trauma. He agreed that "theoretically" this could be the result of an accident, but he noted that when someone fell on an object, the injury pattern would usually reflect a "broad surface impact point." No such impact point was found here.
 
 
 10
 The doctor testified that the medical record from the pediatric intensive care unit showed bilateral hemorrhages on the back surfaces of the inner portion of the child's eyes. These bilateral retinal hemorrhages, he testified, were "[a]bsolutely consistent with an injury known as the shaken child." The "shaken child syndrome," according to Dr. Nichols, occurred when a child was shaken vigorously enough to tear the small blood vessels around the brain and in the back of the eye. Such a shaking could result in "bilateral thin acute subdural hemmatoma, and cerebral edema in death."
 
 
 11
 Dr. Nichols estimated that Christopher's head wounds all occurred within a 24-hour period prior to the child's admission to the hospital. If the contusions were the result of blows to the head, he opined, "probably four separate blows" were necessary to produce the eleven separate contusions. (Unlike the head wounds, the doctor said, the contusions on Christopher's back "were undoubtedly received sometime later during the child's hospitalization.") If he had received the head injuries two or three days prior to the date he was taken to the hospital, the doctor testified, the child should have demonstrated respiratory and neurological problems well before the hospitalization.
 
 
 12
 At the conclusion of his direct examination, Dr. Nichols was asked whether there was "anything medically consistent with the death of this child that could be called accidental." The reply was, "Not that I can see sir."
 
 
 13
 On cross-examination, Dr. Nichols admitted that it was "conceivable" that the contusions could have been sustained up to 48 hours prior to the child's admission to the hospital. He also admitted there were no fingertip bruises on the child's body, even though fingertip bruises were common in shaken child syndrome. He stated that almost any type of trauma to the head, including a blow to the chin, could produce subdural hematoma. On re-direct, he testified that the absence of fingertip contusions did not rule out the possibility of shaken child syndrome--the "hallmark" of the shaken child syndrome, he stated, was "the finding of bilateral reputable hemorrhages while the child is still alive."
 
 
 14
 Detective Don Knifely, of the Kentucky State Police, testified that he had investigated the incident and in the course of his investigation he observed a gumball machine and a small school desk located near where Christopher supposedly fell. He said that he could not see any blood or hair indicating that the baby had struck either of these objects.
 
 
 15
 The defense brought in several relatives and close friends of Mr. Smith to testify that he had never hit Christopher or lost his temper with him in their presence. Mr. Smith took the stand in his own defense, and he testified that he had entered Christopher's room on the afternoon in question and had found Christopher lying on the floor on top of the gumball machine. Smith surmised that the child had fallen out of his playpen and hit his head. Two or three days before this, Smith testified, Christopher had been struck by a toy tractor while playing with other small children at a friend's house.
 
 
 16
 Ms. Masden testified that on the morning of the accident Christopher hit his head with a toy. She said that on the same day Christopher had also fallen and hit his head on his walker and on a coffee table. Christopher was just beginning to walk, she explained, and he was clumsy and frequently hit his head on things.
 
 
 17
 Ms. Masden testified that she had married Mr. Smith after Christopher's death. She was carrying his unborn child at the time of trial.
 
 
 18
 The jury found Mr. Smith guilty of reckless homicide. The conviction was affirmed on direct appeal, and the Kentucky Supreme Court denied a motion for discretionary review. Mr. Smith then brought the present habeas corpus action in federal court, contending that the evidence introduced at trial had been insufficient to support the conviction. The case was referred to a magistrate, who recommended denial of the writ. The district court adopted the magistrate's recommendation following a de novo review of those portions of the report to which the petitioner had objected. This appeal followed.
 
 II
 
 19
 "The relevant question," in a case of this type, "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis supplied).
 
 
 20
 In the case at bar the jury was called upon to decide whether to believe Mr. Smith, or to conclude on the basis of Dr. Nichols' testimony that the baby had been subjected to a violent shaking. Complicating the case were the fact that fingertip bruises, which normally accompany the shaken child syndrome, were absent here, and the fact that Mr. Smith appeared to lack any proclivity for violence or motive for injuring the child.
 
 
 21
 With regard to the absence of fingertip bruises, Dr. Nichols testified that the most important hallmarks of shaken child syndrome were bilateral subdural bleeding and bleeding behind the eyes, both of which were present here. See In Re Lou R., 131 Misc.2d 138, 499 N.Y.S.2d 846, 849 (Fam.Ct.1986), citing Child Abuse and Neglect Litigation: A Manual for Judges 13 (U.S. Dept. of Health & Human Services, Publication No. 80-30268, March 1981) ("The most common symptoms [of Whiplash-Shaken Infant Syndrome], which can be inflicted by seemingly harmless shakings, are bleeding and/or detached retinas and other bleeding inside the head.") See also State v. McClary, 207 Conn. 233, 541 A.2d 96 (1988) (subarachnoid hemorrhaging and retinal hemorrhaging were found to be result of shaken child syndrome; no mention of fingertip bruises).
 
 
 22
 As to the lack of motive, it is significant that Mr. Smith was only convicted of reckless homicide; it was not necessary for the Commonwealth to show that Mr. Smith intended to kill the child. Further, the absence of any propensity for violence or apparent motive for harming Christopher was offset by what a rational jury could easily have found to be the lack of any other acceptable explanation of how the child was so seriously injured. Doctor Nichols testified that it was highly unlikely that the irregular pattern of eleven contusions on the baby's head could have been the result of a single impact with a solid object such as the gumball machine. And Detective Knifely stated that he did not see any remnants of blood or hair in any of the objects in the room.
 
 
 23
 The petitioner argues that the eleven contusions could have been sustained two or three days earlier when Christopher was hit with a toy tractor by another child. But the doctor stated that it was unlikely that the contusions were inflicted even forty-eight hours before the admission to the hospital; it was much more likely that the injury was inflicted within twenty-four hours of admission. And even if the toy tractor incident had occurred within the relevant time frame, there is some doubt as to whether a blow or series of blows by another young child could have caused the subdural hematoma seen here. As Doctor Nichols stated, a "firm stroke"--the equivalent of three or four blows to the head "with an adult fist"--was required to produce injuries of this severity.
 
 
 24
 In some ways this case resembles Watson v. Marshall, 784 F.2d 722 (6th Cir.1985), cert. denied, 476 U.S. 1107 (1986). That too was a habeas case brought by a man who had been convicted in connection with the death of a baby who apparently died of trauma to the head. The coroner testified that in examining the baby's body he found brain and spinal cord hemorrhaging that the child could not have inflicted on himself except by a fall off a thirty-story building. Several doctors testified that the injuries had occurred within twelve hours of the baby's admission to the hospital; the defendant was the only adult who had been with the infant for at least four hours prior to admission. Further, the defendant testified that he found the child, who had been in his care for one month, to be "aggravating" and to have "strange looking eyes." Id. at 724. In affirming the denial of habeas relief, we wrote that "a rational trier of fact could have found beyond a reasonable doubt that [the habeas petitioner] was the individual who killed [the baby]. As the state appellate court and the federal district court reasoned, although the evidence against petitioner is circumstantial, it can only be reconciled with a theory of guilt." Id. at 725.
 
 
 25
 The evidence in Watson was probably more damning than the evidence here; in particular, the open manifestation of malice toward the dead child on the part of the petitioner in Watson would appear to differentiate that case from this one. The medical evidence presented here was just as strong as that in Watson, however, and we cannot say that a rational trier of fact could not have interpreted the evidence as demonstrating beyond a reasonable doubt that Mr. Smith had committed reckless homicide.
 
 
 26
 The judgment of the district court is AFFIRMED.