STATE OF CONNECTICUT *v.* MOSTAFA GEWILY
(SC 17633)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 8—officially released December 19, 2006

*Sarah F. Summons*, special public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*,

state's attorney, and *James Dinnan*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Mostafa Gewily, guilty of one count of risk of injury to a child in violation of General Statutes (Rev. to 2001) § 53-21 (a) (1)[1] and one count of custodial interference in the first degree in violation of General Statutes § 53a-97. The trial court rendered judgment in accordance with the jury verdict,[2] and the defendant appealed,[3] claiming that the evidence was insufficient to support his conviction of risk of injury to a child.[4] We disagree and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant, an Egyptian national, married his wife, Maria Gewily (Maria), in 1994. Shortly after their marriage, the couple began living in Meriden in the home of Maria's mother. In March, 1998, Maria gave birth to S,[5] the couple's only child.

Not long after S's birth, the couple's marriage began to deteriorate, and the defendant became verbally and

---

[1] General Statutes (Rev. to 2001) § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

All references to § 53-21 in this opinion are to the revision of 2001.

[2] The trial court imposed consecutive sentences of ten years imprisonment on the count of risk of injury to a child and five years imprisonment on the count of custodial interference in the first degree, for a total effective sentence of fifteen years imprisonment.

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] The defendant has not challenged his conviction of custodial interference in the first degree.

[5] We refer to the child by first initial only to protect his privacy interests.

physically abusive to Maria. On one occasion, Maria called the police after the defendant slapped her and knocked her down. When the defendant learned that Maria had called the police, he threatened to kill her. Although the defendant never was verbally or physically abusive to S directly, S often was present when the defendant was abusive to Maria.

In December, 2000, the defendant and Maria began living apart. Maria continued to reside with S at her mother's home in Meriden, and the defendant moved to West Haven. Maria, however, regularly took S to visit the defendant at his West Haven residence, where Maria and S frequently stayed overnight. According to Maria, her reason for bringing S to stay with the defendant was to ensure that S would continue to have a relationship with his father.

After the defendant and Maria separated, S became more and more reluctant to spend time with the defendant. On one occasion, while S was waiting at home for the defendant to pick him up for a scheduled visit, S told his grandmother, Maria's mother, that he did not want to go with the defendant. S also informed her that she should not go outside when the defendant arrived because the defendant had told S that he was "going to cut [his grandmother's] head off and [her] stomach with a big knife." The defendant's threat against S's grandmother was only one of a number of such threats that the defendant had made against Maria and her mother. In fact, the defendant was so upset about his separation and possible divorce from Maria that he told one of Maria's relatives that "he would kill [S] . . . while [Maria] watched, and then he would kill her, and then he would kill himself before the divorce happened."

In October, 2001, approximately one year after the couple's separation, Maria filed for divorce. Shortly

thereafter, on November 9, 2001, Maria obtained a restraining order prohibiting the defendant from entering her home and from threatening, assaulting or otherwise harassing her. Pursuant to the order, Maria was awarded temporary custody of S. The order, however, permitted the defendant unsupervised visitation with S on Sundays from noon until 4 p.m., and on Mondays from noon until 5 p.m.

On Sunday, December 9, 2001, the defendant picked up S in accordance with the visitation order and informed Maria that he probably would take S to a shopping mall. The defendant, however, did not return with S by 4 p.m. as the order required. Maria finally called the Meriden police department at approximately 7 p.m. and reported that the defendant had not returned with S as the order required. The officer with whom Maria spoke advised her to wait a few more hours to be sure that the defendant was not unavoidably late due to circumstances beyond his control.

At approximately 10 p.m. that evening, Maria called the Meriden police department again and informed a duty officer that the defendant still had not returned with S. The Meriden police then contacted the West Haven police department, which dispatched an officer to the defendant's apartment. Upon arriving there, the West Haven officer was informed by one of the defendant's neighbors that he had moved out at least one week earlier.

In the early morning hours of December 10, 2001, Maria received a telephone call from the defendant. When Maria asked the defendant where he was, the defendant implied that he was at a casino. Maria, however, could hear background noises that led her to believe that he was at an airport. Moreover, when the defendant permitted Maria to speak with S, S asked her if she was going to "come on the airplanes . . . ." In

fact, airline records revealed that the defendant and S had flown from New York to Cairo, Egypt, arriving on December 10, 2001.

The defendant next contacted Maria on December 15, 2001. He told her that he and S were in California but did not permit her to speak to S. Maria did not hear from the defendant again until December 24, 2001, at which time the defendant informed her that he had taken S to Cairo. The defendant allowed Maria to speak with S, who again inquired of Maria whether she would be "coming over . . . ." In an effort to avoid upsetting S, Maria explained that she would see him soon.

The next day, the defendant telephoned Maria but did not allow her to speak with S. In that conversation, the defendant blamed Maria for the family's separation and threatened to reenter the United States under an alias and kill her.

From December, 2001, until the summer of 2002, the defendant telephoned Maria at least twenty times. Only occasionally, however, did the defendant permit Maria to talk with S. When Maria was permitted to speak with S, their conversation focused on whether she would be "coming over." Maria repeatedly tried to comfort S by reassuring him that she would be visiting him soon. Although the defendant provided Maria with a telephone number that she could use to contact him in Egypt, Maria was not always able to get through to S when she used that number.

Maria stopped receiving telephone calls from the defendant in the summer of 2002. Maria also abandoned her efforts to communicate with S because the defendant had made it so difficult for her to do so, emotionally and otherwise. Meanwhile, in March, 2002, Maria's divorce from the defendant became final. The divorce decree awarded full custody of S to Maria.

Approximately one year after taking S from his home in Meriden and relocating to Egypt, the defendant returned to the United States. On December 24, 2002, the defendant was arrested at John F. Kennedy International Airport in New York. He did not, however, have S with him.

On one occasion following his arrest, the defendant, who was incarcerated in lieu of bail pending trial, placed a telephone call from prison to Esam Awad, a friend and former coworker. During that conversation, the defendant explained to Awad that he was concerned about S's well-being. In light of that concern, the defendant provided Awad with a Cairo telephone number and asked Awad to call it to find out if S was alright. The defendant also instructed Awad to inform the woman who answered the telephone that she was not to release S to anyone without the defendant's prior approval. Awad followed the defendant's instructions and was informed by the woman with whom he spoke that S was "good" and "feeling well . . . ."

Since his arrest, the defendant steadfastly has refused to disclose S's location. Despite efforts by the Federal Bureau of Investigation and the United States Department of State to locate S, his whereabouts remain unknown.[6] With these facts in mind, we turn to the defendant's claim that the evidence was inadequate to support his conviction of risk of injury to a child.

The defendant's claim of evidentiary insufficiency is twofold: first, that the state presented no evidence concerning the actual status of S's health; and second,

[6] Evidence adduced at trial indicated that Egypt is not a signatory to the Hague Convention, an international treaty that establishes, inter alia, the legal rights and procedures pursuant to which a child unlawfully removed from his or her home country may be returned to that country. Because Egypt is not a party to the Hague Convention, it has not been possible to invoke the provisions of that treaty for the purpose of seeking S's return to the United States.

that the state failed to establish that the defendant had created a situation likely to be harmful to S's health. We reject the defendant's first argument because the state was not required to present evidence of S's health. We also reject the defendant's second argument because the evidence amply supports the jury's finding that the defendant caused S to be placed in a situation likely to be detrimental to his health.

Our standard of review of the defendant's claim is well established. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Jackson,* 257 Conn. 198, 204–205, 777 A.2d 591 (2001).

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Inter-

nal quotation marks omitted.) *State* v. *Garner*, 270 Conn. 458, 472–73, 853 A.2d 478 (2004).

A person is guilty of violating General Statutes (Rev. to 2001) § 53-21 (a) (1) if that person "wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . ." As we recently have observed, "[a]lthough it is clear that [t]he general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of [others] . . . we long have recognized that subdivision (1) of § 53-21 [(a)] prohibits two different types of behavior: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the [child's] moral or physical welfare . . . and (2) acts directly perpetrated on the person of the [child] and injurious to his [or her] moral or physical well-being." (Citation omitted; internal quotation marks omitted.) *State* v. *Robert H.*, 273 Conn. 56, 65, 866 A.2d 1255 (2005). Thus, "the first part of § 53-21 (1) [(a)] prohibits the creation of *situations* detrimental to a child's welfare, while the second part proscribes injurious *acts* directly perpetrated on the child." (Emphasis in original.) *State* v. *Padua*, 273 Conn. 138, 148, 869 A.2d 192 (2005). In the present case, we are concerned with the portion of § 53-21 (a) (1) relating to the creation of a situation likely to be detrimental to the health of a child.[7] Finally, in addressing a challenge to a finding that the conduct of the accused had caused psychological harm to a child in violation of § 53-21, we recently

---

[7] The state alleged in its information that the defendant had "[wilfully] caused or permitted a child under the age of sixteen years to be placed in such a situation that the health of such child is likely to be injured, in violation of [§] 53-21 (a) (1) . . . ."

observed that the fact finder is not required to "make a determination as to the precise nature or severity of the injury"; id., 157; rather, the fact finder need only decide whether the accused placed the child in a situation that was likely to be psychologically injurious to that child. See id.

The defendant's argument that the state was required to prove that S's health actually was impaired by the defendant's conduct is contrary both to the applicable statutory language and to the cases interpreting that language. Pursuant to the portion of § 53-21 (a) (1) under which the defendant was charged, the state was required to establish only that the defendant wilfully had caused or permitted S to be placed in a situation that likely would be injurious to S's health; the state was not required to prove that S, in fact, had been harmed or injured as a result of the defendant's conduct. See, e.g., *State* v. *Perruccio*, 192 Conn. 154, 159–60, 471 A.2d 632 (state need not show that child actually was harmed, only "the creation of a prohibited situation"), appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984); *State* v. *Davila*, 75 Conn. App. 432, 437, 816 A.2d 673 ("[t]he relevant inquiry is whether the defendant committed any act that was likely to endanger the life or limb, or impair the health, of the [child], not whether the [child] actually [was] injured"), cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004). In other words, actual injury is not an element of the "situation" prong of § 53-21 (a) (1). Because that provision focuses on the conduct of the accused rather than the harm that the child actually may have suffered, we reject the defendant's claim that he is entitled to a judgment of acquittal with respect to the risk of injury count on the ground that the state failed to adduce evidence of the status of S's health.

The defendant also contends that the evidence was insufficient to establish that he wilfully created a situation that was likely to be harmful to S's health.[8] In particular, the defendant asserts that, because there is virtually nothing in the record detailing the specific circumstances under which S has lived since he was removed from Maria's custody, the jury necessarily was required to rely on conjecture and speculation in determining whether the defendant had caused S to be placed in a situation likely to be detrimental to his health. As the state aptly notes, the crux of the defendant's argument is that, because the defendant's abduction and prolonged concealment of S since that abduction have prevented the state from establishing the status of S's health, there was insufficient evidence to support the jury's finding that S's emotional or psychological condition was likely to have been impaired as a result of the situation in which he had been placed by the defendant. This contention also is without merit.

The state established that, as a result of the defendant's conduct, S was suddenly and indefinitely deprived of the love and affection of Maria, his mother and custodial parent, when he was only three years old. The jury reasonably could conclude that that separation, coupled with the fact that S found himself in entirely new surroundings in a foreign country, was likely to be highly traumatic to S and, therefore, harmful to his mental and emotional health. Although it is true that, on occasion, the defendant permitted Maria to

---

[8] We note that the defendant appears to suggest that the state was required to prove that the defendant's conduct created a situation that was likely to be inimical to S's physical, rather than mental, well-being. To the extent that the defendant advances such a claim, it is foreclosed by our holding in *State* v. *Payne*, 240 Conn. 766, 771–73, 695 A.2d 525 (1997), overruled in part on other grounds by *State* v. *Romero*, 269 Conn. 481, 490, 849 A.2d 750 (2004), in which we concluded that the term "health," as used in the "situation" prong of § 53-21 (a) (1), includes *mental* health as well as physical health.

speak with S on the telephone, those sporadic conversations were no substitute for the care and affection that S would have received from Maria if the defendant had not taken S from her in blatant violation of the court-ordered custodial arrangements. Indeed, in Maria's conversations with S, he regularly inquired about when she was coming to see him, revealing his distress about their separation. Moreover, the defendant so closely monitored and regulated Maria's conversations with S that Maria, out of frustration and despair, eventually abandoned her efforts to communicate with S by using the telephone number that the defendant had given to her.

We previously have noted, albeit in a somewhat different context, that significant harm is likely to result from the forced separation of a child from his or her parents. In *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 455 A.2d 1313 (1983), we observed that "[u]ninterrupted home life comports . . . with each child's biological and psychological need for unthreatened and unbroken continuity of care by his parents." (Internal quotation marks omitted.) Id., 286 n.11. We also have observed that children who are separated from their parents may "suffer anxiety and depression . . . [and] are forced to deal with new caretakers, playmates, school teachers, etc. As a result they often suffer emotional damage and their development is delayed." (Internal quotation marks omitted.) Id. Thus, "[t]here is little doubt that breaches in the familial bond will be detrimental to a child's well-being." *Pamela B.* v. *Ment*, 244 Conn. 296, 310, 709 A.2d 1089 (1998). S's repeated questions to Maria about when she would be coming to see him reveal that S had developed a strong bond with Maria, such that losing contact with her undoubtedly was especially worrisome and painful for S. In light of the defendant's current circumstances, moreover, the jury was entitled to conclude that the end result of the

defendant's unlawful conduct was to deprive S of the love, support and companionship of *both* of his parents.

Finally, in view of the court order awarding custody of S to Maria, the jury reasonably could have found that it was not in S's best interests to be forced to reside with the defendant. Indeed, the state demonstrated that the defendant had a violent and threatening disposition, and that he displayed that temperament in S's presence. As a result, S increasingly—and justifiably—feared spending time with the defendant. Under such circumstances, the jury reasonably could have concluded that it was unhealthy for S to reside with the defendant, in a foreign country, without any opportunity to be with his mother. Contrary to the defendant's claim, therefore, the evidence adduced by the state was more than adequate to permit a finding beyond a reasonable doubt that the defendant, in abruptly and unlawfully abducting S from his home in Meriden and relocating him to Egypt, thereby depriving him of contact with his custodial parent, wilfully caused S to be placed in a situation likely to be harmful to his mental health and well-being in violation of § 53-21 (a) (1).

The judgment is affirmed.

In this opinion the other justices concurred.