STATE OF CONNECTICUT *v.* RICCARDO ST. CYR
(AC 27188)

Flynn, C. J., and Gruendel and Rogers, Js.

Argued January 11—officially released March 27, 2007

*Dante R. Gallucci,* for the appellant (defendant).

*Jennifer E. Walters,* certified legal intern, with whom were *Frederick W. Fawcett,* supervisory assistant state's attorney, and, on the brief, *Jonathan C. Benedict,* state's attorney, and *Howard S. Stein,* assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Riccardo St. Cyr, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1) and risk

of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant argues that the trial court improperly denied his motion for a judgment of acquittal. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, Riccardo St. Cyr, Jr., was born on May 2, 2003. He was the child of Paula Belleza and the defendant, with whom he lived in Bridgeport. He died on June 30, 2003.

By all medical accounts, the victim was a normal, thriving baby prior to the events of June 30, 2003. The victim visited his pediatrician, Edward Figueroa, on May 12 and on June 2, 12 and 24, 2003. Those visits involved complete physical examinations that included palpations of the victim's head, which revealed no neurological deficits or abnormalities.[1] Notably, Figueroa performed a full physical examination on the victim six days prior to his death. He found no sign of injury to the victim's head or any bruising on the victim's body.

On the morning of June 30, 2003, the victim was lying in bed next to his mother. Belleza testified that at approximately 6 a.m., the victim's eyes were open, and he was moving and coughing. After feeding the victim, Belleza went back to sleep. The defendant subsequently woke her and drove her to work, where she arrived at noon. The defendant, unemployed at the time, then returned home with the victim. From that time onward, the victim remained in the sole care and custody of the defendant.

At approximately 3 p.m., the defendant contacted Belleza at work. He informed her that the victim was

---

[1] Figueroa testified that a palpation of the head involves feeling the texture, shape and consistency of a baby's head and is an important part of the physical examination.

"throwing up through his nose and mouth." The defendant picked up Belleza from work at 3:30 p.m., at which point Belleza immediately examined the victim, who was in the backseat of the vehicle. As she testified: "I tried to move him, but he didn't move. He was like a Muppet.[2] And then I started screaming. I was asking [the defendant], what happened to my baby?" They proceeded to the emergency room at Bridgeport Hospital, where various hospital personnel treated the baby. Maria Morais, who first encountered the victim, testified that he was blue. Morais further noted that although Belleza was nervous, the defendant seemed to be "very calm." Janet O'Neil, a registered nurse, testified that upon seeing the victim, she knew that "the baby was dead." Specifically, she stated that "the baby was still, the lips were blue. The baby had this grayish ashen color too, and just looked very limp and dead." The victim had no pulse. O'Neil performed cardiopulmonary resuscitation on the victim to no avail. Amidst her efforts, O'Neil observed bruising on the victim's forehead.

Lisa Platt, another registered nurse who responded to the emergency, also noticed the bruising. She testified that "the first thing that was most prominent was the baby had symmetrical bruises to the head, one with abrasions, to both temple areas." Platt saw a hand mark on the victim's arm and other bruises on his shoulder and upper extremities. Like O'Neil, Platt testified that the defendant was "unusually calm," in contrast to Belleza, who was "upset and hysterical and wasn't making much sense."

Two physicians responded to the emergency. Samina Shahabuddin, an emergency room physician, testified

---

[2] A "Muppet" is a type of puppet created by the puppeteer, Jim Henson, for children's television and movie productions. See *Hormel Foods Corp.* v. *Jim Henson Productions, Inc.*, 73 F.3d 497, 500 (2d Cir. 1996).

that the victim "appeared lifeless, limp. There was no pulse. There was no heartbeat. The child was not breathing." Shahabuddin observed "a bump on the victim's left forehead and the nurse pointed out some bruising on the arms." Shahabuddin testified that the bump on the victim's head was a recent injury. Christian Nagy, a resident physician, also treated the victim, continuing resuscitation efforts for roughly half an hour; he pronounced the victim dead at 4:41 p.m. Nagy testified that the victim had a bruise on the left side of his forehead, which he characterized as a skull fracture. In addition, Figueroa arrived at the emergency room after the victim was pronounced dead. Figueroa noticed the bruising on the victim's forehead and testified that it appeared "relatively fresh."

An autopsy subsequently was performed. Harold Wayne Carver II, a forensic pathologist and the state's chief medical examiner, opined that the cause of death was "blunt traumatic head injury" that required "substantial force." He stated that the victim suffered a depressed skull fracture on the left side of his head, which occurs when "the piece of bone is broken and is pushed in." Carver further testified that vomiting commonly is associated with that injury. He stated that a baby with that injury "would not be able to survive for very long and would be unconscious pretty much at the time the injury was inflicted. And some people with this injury could survive for a while without medical assistance. But an hour is a long period of time." In addition, Dean Uphoff, a neuropathologist, examined the victim's brain. He opined that the cause of death was blunt trauma to the head that resulted in a fracture of the skull. Uphoff stated that the survivability of that injury would be "short term survival. Hours at the outside." Uphoff concluded that the victim sustained the injury "within just a couple of hours at the most" of the time of death.

Following the close of the state's case-in-chief, the defendant filed a motion for a judgment of acquittal, which the court denied. The jury thereafter found the defendant guilty of manslaughter in the second degree and risk of injury to a child, and the court rendered judgment accordingly. From that judgment, the defendant now appeals.

On appeal, the defendant claims that the court improperly denied his motion for a judgment of acquittal because there was insufficient evidence to support his conviction. "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [A reviewing court] cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[I]t is a function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

Because [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . [P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts. . . . Moreover, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 517–19, 782 A.2d 658 (2001). With that standard in mind, we turn to the claims of evidential insufficiency.

I

The defendant first claims that there was insufficient evidence in the record to support the jury's verdict that he was guilty of manslaughter in the second degree. Pursuant to § 53a-56 (a) (1), a person is guilty of that offense when he recklessly causes the death of another person. The state therefore was required to establish that the defendant (1) acted recklessly and (2) caused the death of the victim.

"A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13). In the present case, the jury was presented with undisputed evidence that the victim was in the defendant's sole custody and care between the hours of 12 p.m. and 3:30 p.m. on June 30, 2003. Despite a steady cough, the victim appeared fine that morning. When Belleza said goodbye to the victim at 12 p.m., he was responsive and alert. At approximately 3 p.m., the defendant contacted Belleza and informed her that the victim was vomiting from the mouth and nose. When Belleza next saw her son, he was lifeless.

The jury heard the testimony of hospital personnel who treated the victim. They observed bruising to the victim's head and body. The jury further heard the testimony of the medical examiner who stated that the victim's cause of death was "blunt traumatic head injury" that required "a great deal of force." He indicated that the injury suffered by the victim likely was inflicted within hours of the time of death and that the victim

likely was unconscious "at the time the injury was inflicted." That appraisal was confirmed by the neuropathologist's testimony that the victim sustained the injury "within just a couple of hours at the most" of the victim's death.

The jury further heard testimony from Figueroa that the defendant had informed him that the victim began to choke and vomit at 2 p.m. As the defendant did not contact Belleza until approximately one hour after that behavior began, the jury could infer that the defendant took no action and contacted no one for one hour in response to the emergency. The failure to assist a victim in a timely manner may establish that a defendant "subjectively realized and chose to ignore a substantial risk . . . ." *State* v. *McMahon*, 257 Conn. 544, 568–69, 778 A.2d 847 (2001), cert. denied, 534 U.S. 1130, 122 S. Ct. 1069, 151 L. Ed. 2d 972 (2002). Furthermore, the jury also was free to credit the testimony of hospital personnel that the defendant was unusually calm when he arrived at the emergency room with an unconscious baby. In light of that evidence, the jury reasonably could have concluded that the defendant consciously disregarded a substantial and unjustifiable risk that the victim's death might occur.

To convict the defendant of manslaughter in the second degree, the state also had to present sufficient evidence that he proximately caused the victim's death. See *State* v. *Guitard*, 61 Conn. App. 531, 541, 765 A.2d 30, cert. denied, 255 Conn. 952, 770 A.2d 32 (2001). The state concedes that its case necessarily was based on circumstantial evidence. The jury had before it the testimony of the medical examiner and neuropathologist that the cause of death was a blunt traumatic head injury requiring great force that was not the result of an accident. The jury also heard the testimony of Belleza that, at 12 p.m., the victim was alert and responsive and appeared fine. There was evidence that the victim

began choking and vomiting at 2 p.m., that the defendant first contacted Belleza at 3 p.m., and that when they arrived at the emergency room at 4 p.m., hospital personnel immediately observed bruising to the victim's head. When coupled with the testimony of the medical examiner and the neuropathologist that the victim sustained that injury within hours of his death at 4:41 p.m., the jury reasonably could have concluded that the defendant caused the victim's injuries.

The fact that the state presented no evidence of precisely how the victim obtained his head injury does not undermine that conclusion. In *State* v. *Sivri*, 231 Conn. 115, 646 A.2d 169 (1994), for instance, there was evidence that the victim's last known location was the defendant's residence. In that case, there admittedly was "no body or evidence of body parts . . . no evidence of the specific type of weapon used . . . no evidence of the specific type of wound inflicted on the victim . . . and no evidence of prior planning, preparation or motive." (Citations omitted.) Id., 127. At trial, the state's forensic scientist was asked what had caused the victim's injury. He responded: "I have no idea. I cannot come here to tell you. I only can say [that the victim] lost sufficient amount of blood . . . ." (Internal quotation marks omitted.) Id., 123. Our Supreme Court nevertheless concluded that the circumstantial evidence and the reasonable inferences drawn therefrom were sufficient to support the jury's finding that the defendant caused the victim's death. By contrast, in the present case the victim's body was available for examination, and the jury was presented with testimony as to the cause of death, namely, the skull fractured by substantial force in the hours immediately preceding death.

A primary defense theory pursued at trial and repeated in the defendant's appellate brief concerned a car accident that occurred one week prior to the

victim's death. Belleza testified that the defendant informed her that on June 23, 2003, he "stopped short with [his] car" and, although the vehicle sustained no damage, the victim "bounced forward and struck his left cheek." The jury, however, heard testimony refuting that theory. Specifically, when asked if the June 23, 2003 car accident could have caused the victim's head injury, the neuropathologist testified that "it would be difficult to get a fracture of the posterior, the back of the skull in a forward facing . . . car seat. And, had a fracture occurred at this time, it would have had severe consequences at this time. At the least he would have been unconscious. [A] severe blow to the head resulting in a fracture does not leave an individual unscathed neurologically. There are serious consequences. Loss of consciousness, usually loss of heart activity and breathing." Moreover, Figueroa testified that he performed a complete physical examination on the victim the day after that accident, which included a neurological exam. Figueroa found no signs of fracture, cephalo-hematoma or bruising on the victim's head. The jury also heard Belleza's testimony that it was the victim's cheek and not his head that was struck during the June 23, 2003 car accident. Finally, the jury was free to credit the testimony of the medical examiner and neuropathologist that the victim sustained the head injury within hours of his death. In light of the foregoing, we conclude that there is a reasonable view of the evidence that supports the jury's verdict of guilty of manslaughter in the second degree.

## II

The defendant also argues that there was insufficient evidence in the record to support the jury's verdict that he was guilty of risk of injury to a child in violation of § 53-21 (a) (1). We disagree.

Our Supreme Court recently addressed the elements of that offense in *State* v. *Gewily*, 280 Conn. 660, 668,

911 A.2d 293 (2006). It stated: "A person is guilty of violating General Statutes (Rev. to 2001) § 53-21 (a) (1) if that person wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . . [A]lthough it is clear that [t]he general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of [others] . . . we long have recognized that subdivision (1) of § 53-21 [(a)] prohibits two different types of behavior: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the [child's] moral or physical welfare . . . and (2) acts directly perpetrated on the person of the [child] and injurious to his [or her] moral or physical well-being. . . . Thus, the first part of § 53-21 (1) [(a)] prohibits the creation of *situations* detrimental to a child's welfare, while the second part proscribes injurious *acts* directly perpetrated on the child." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gewily,* supra, 668. Those two types of behavior encompassed within § 53-21 (a) (1) have been termed the situation and act prongs. See *State* v. *Robert H.,* 273 Conn. 56, 70 n.10, 866 A.2d 1255 (2005); *State* v. *Fagan,* 92 Conn. App. 44, 51 n.4, 883 A.2d 8, cert. denied, 276 Conn. 924, 888 A.2d 91 (2005).

This appeal concerns the act prong. The state's amended information alleged that between the hours of 12 p.m. and 3 p.m. on June 30, 2003, the defendant "did acts likely to impair the health of a child under sixteen (16) years of age in violation of [§] 53-21 (a) (1) . . . ." The pertinent inquiry, then, is whether the evidence presented at trial sufficiently established that the defendant wilfully committed an act likely to impair

the victim's health. We already have determined that the jury reasonably could have concluded that the defendant caused the victim's blunt traumatic head injury. See part I. The defendant maintains that the evidence is insufficient to demonstrate the requisite intent.

Risk of injury to a child is not a specific intent crime. As we have explained, "[i]t is not necessary, to support a conviction under § 53-21, that the [accused] be aware that his conduct is likely to impact a child . . . . Specific intent is not a necessary requirement of the statute. Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute." (Citation omitted; internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 438, 816 A.2d 673, cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004). Instead, a general intent is required. See *State* v. *McClary*, 207 Conn. 233, 240, 541 A.2d 96 (1988) ("[a]ll that [is] required [is] the general intent on the part of the defendant to perform the act which resulted in the injury"). A jury can find that general intent on the part of a defendant when it reasonably concludes that (1) the defendant intended the resulting injury to the victim, or (2) the defendant knew that the injury would occur or (3) that the defendant's conduct was of such a character that it demonstrated a reckless disregard of the consequences. See *State* v. *Guitard*, supra, 61 Conn. App. 543.

The evidence presented at trial demonstrated that the victim died of a blunt traumatic head injury that required substantial force in the hours immediately preceding his death. The evidence further established that the victim was in the defendant's sole custody and care in those hours immediately preceding his death. The medical examiner testified that vomiting commonly is associated with the type of injury suffered by the victim.

Figueroa testified that the defendant told him that the victim began vomiting at 2 p.m. Nevertheless, the evidence indicated that the defendant waited approximately one hour before contacting anyone and sought no medical attention for the victim during that time. Moreover, when Belleza saw her son at approximately 3:30 p.m., he was lifeless. On those facts, the jury reasonably could have concluded that the defendant's conduct was of such a character that it demonstrated a reckless disregard of the consequences.

In *State* v. *McClary*, supra, 207 Conn. 233, the victim, a six month old child, suffered an irreversible brain injury. Medical testimony indicated that her injury was caused by severe shaking. Convicted of risk of injury to a child, the defendant father appealed, alleging evidential insufficiency as to the required general intent of that offense. Our Supreme Court affirmed the judgment of conviction, concluding that medical testimony may establish a wilful act. As it stated: "For a conviction the [trier of fact] had to find proven beyond a reasonable doubt only that the defendant, by a volitional act, shook the child and caused the injury. There was ample medical testimony . . . which established the cause of injury as a vigorous or violent shaking and the [trier of fact] could have relied on that evidence to find that the shaking was done intentionally and not accidentally." Id., 244. Likewise, the medical examiner and neuropathologist in the present case testified as to the severity and causation of the victim's head injury. The official cause of death was a blunt traumatic head injury resulting in a fractured skull. As Carver testified, the skull of a child "is not only tough, but also somewhat flexible and resilient. So, it takes a good deal of force to break it . . . ." In light of that evidence, the jury reasonably could have found that the defendant committed a wilful act that caused the injury. We conclude that the cumulative effect of the evidence, including

reasonable inferences drawn therefrom, viewed in the light most favorable to sustaining the verdict, was sufficient to justify the jury's verdict that the defendant was guilty of risk of injury to a child.

The judgment is affirmed.

In this opinion the other judges concurred.