STATE OF CONNECTICUT *v.* LUCAS BETANCOURT
(AC 27955)

McLachlan, Gruendel and Pellegrino, Js.

Argued January 16—officially released March 25, 2008

*Joseph A. Jaumann*, special public defender, for the appellant (defendant).

*Raheem L. Mullins*, deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly* and *Gail P. Hardy*, state's attorneys, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Lucas Betancourt, appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), conspiracy to commit kidnapping in the first degree in violation of General Statutes §§ 53a-48 and 53a-92 (a) (2) (B), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (2), robbery in the second degree in violation of General Statutes § 53a-135 (a) (1), and conspiracy to commit robbery in the second degree in violation of §§ 53a-48 and 53a-135 (a) (1). On appeal, the defendant claims that (1) there was insufficient evidence from which the jury could have found him guilty of the charged crimes and (2) the prosecutor engaged in impropriety that deprived him of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 29, 2005, the defendant drove his two nephews, Ricco Torres and Felipe Buitrago, his friend, Michael Meteiver, and his own six year old daughter to a McDonald's restaurant in Waterbury in a green Ford Escort. While at McDonald's, the defendant and Meteiver had a discussion about stealing guns from the home of Meteiver's father-in-law, Mario Fusco, the

victim. Meteiver was aware that the victim's son had a gun collection and that it had been kept at the victim's home. The defendant then drove his nephews, Meteiver and his daughter to the victim's home.

After arriving at the victim's home, the defendant ordered everyone except his daughter out of the car. The defendant directed Buitrago to watch from the front door and to enter the house last. The men then knocked on the victim's door, and when the victim answered, the men pushed themselves into the house, knocking the victim to the floor and breaking his glasses. After entering, the defendant and Torres bound the victim's hands and feet with duct tape and covered his head with a pillowcase. The defendant then asked the victim where he kept his guns and searched through the house looking for them even though the victim explained that he no longer kept his son's guns in his house. While searching, they stole $150 as well as the victim's bank card and a handgun. The defendant and Meteiver demanded of the victim the personal identification number for his bank card. After receiving it, the two men went to a Webster Bank automatic teller machine and tried unsuccessfully to withdraw funds from the victim's account. They then returned to the victim's home. After arriving, the defendant, Meteiver, Buitrago and Torres returned to the car where the defendant's daughter was waiting, and the defendant drove to his apartment in Naugatuck where he left his nephews and his daughter. The defendant then left the apartment with Meteiver. When he returned, he gave Buitrago the gun that either he or Meteiver had stolen from the victim's home and told Buitrago to put the gun in a drawer under the bed of the defendant's daughter. The defendant left the apartment again.

In the meantime, the victim had called the police. An interview with the victim led the police to believe that Meteiver might be involved in the break-in because he

was the only person who knew the victim had kept his son's gun collection in his home. The police found Meteiver and arrested him on an unrelated charge. During a search of Meteiver's person, the police found the keys to the victim's car and house. Meteiver admitted that he had taken part in the break-in at the victim's house and directed the police to the defendant's apartment to find the other individuals involved.

The police arrived at the defendant's apartment with a search warrant, where they found and arrested Buitrago and Torres. Buitrago told the police that the gun they were looking for was in a drawer under the bed of the defendant's daughter. The police found the gun, which was the gun taken from the victim's home, as well as some money and mail addressed to the defendant. A little while later, the defendant arrived at his apartment and was arrested.

The following day, the police found a green Ford Escort in the driveway next to the defendant's apartment. The police obtained a search warrant for the car and found a roll of duct tape inside. An analysis of the duct tape revealed that the torn end of the duct tape roll matched the torn end found on the victim's socks. Following a jury trial, the defendant was found guilty on all counts. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the testimony given by Buitrago as a witness for the state was inconsistent and vague and failed to prove every element of each of the crimes charged.[1] "The standard of review we apply to

---

[1] Within the defendant's insufficiency claim, he makes several arguments, namely, (1) there was evidence that Buitrago made a written statement explaining that the defendant was not involved in the crimes charged, (2) Buitrago's testimony was inconsistent with the victim's testimony and (3) Buitrago received a sentencing benefit for his testimony implicating the defendant, which evidence was not before the jury when it made its credibility determination.

a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329, 929 A.2d 278 (2007). In conducting our review, we are mindful that "[w]e do not sit as a [seventh] juror who may cast a vote against the verdict based [on] our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer

"[I]t is well settled that [w]hether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses. . . . [T]he [jury] can . . . decide what—all, none or some—of a witness' testimony to accept or reject. . . . [Q]uestions of whether to believe or to disbelieve a competent witness are beyond our review . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ayuso*, 105 Conn. App. 305, 334–35, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008). In addition, "[e]vidence is not insufficient merely because it is conflicting or inconsistent." (Internal quotation marks omitted.) *State* v. *Russell*, 101 Conn. App. 298, 320 n.23, 922 A.2d 191, cert. denied, 284 Conn. 910, 931 A.2d 934 (2007). "[The jury] may believe or disbelieve all or any portion of the testimony offered. . . . A trier of fact is free to reject testimony even if it is uncontradicted . . . and is equally free to reject part of the testimony of a witness even if other parts have been found credible." (Internal quotation marks omitted.) *State* v. *Stewart*, 77 Conn. App. 393, 400, 823 A.2d 392, cert. denied, 265 Conn. 906, 831 A.2d 253 (2003). "[A]n appellate court does not retry the case or evaluate the credibility of the witnesses." (Internal quotation marks omitted.) *Moran* v. *Media News Group, Inc.*, 100 Conn. App. 485, 493, 918 A.2d 921 (2007). Because the defendant's arguments focus exclusively on determinations solely within the province of the jury, they have no merit.

We also decline to review the argument regarding an alleged sentencing benefit bestowed on Buitrago in exchange for his testimony against the defendant. A review of the record does not reveal whether Buitrago was receiving a sentencing benefit. As this information is not a part of the record, this argument is not properly before us. "This court will not speculate on what is not in the record." *State* v. *Hermann*, 38 Conn. App. 56, 68, 658 A.2d 148, cert. denied, 235 Conn. 903, 665 A.2d 904 (1995).

to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005).

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 283 Conn. 329–30. "[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis." (Internal quotation marks omitted.) *State* v. *St. Cyr*, 100 Conn. App. 189, 195, 917 A.2d 578, cert. denied, 282 Conn. 915, 924 A.2d 140 (2007).

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Davis*, supra, 283 Conn. 330. Our review of the record indicates that there was evidence before the jury from which it could find the defendant guilty of the crimes charged beyond a reasonable doubt. Because the defendant has raised his claim in general terms, we address each crime in turn.

### A

The defendant was convicted of kidnapping in the first degree in violation of § 53a-92 (a) (2) (B), which provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts[2] another person and . . . (2) he restrains[3] the person abducted with intent to . . . (B) accomplish or advance the commission of a felony . . . ." In the present case, Buitrago testified that the defendant forced his way into the victim's home and duct taped the victim's arms and

[2] General Statutes § 53a-91 (2) provides: " 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation."

[3] General Statutes § 53a-91 (1) provides in relevant part: " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . ."

legs, restricting his movement. A pillowcase was then put over the victim's head. Once the victim was secure, Buitrago testified, the defendant asked the victim where the guns were and proceeded to search the home for guns. The victim, although unable specifically to identify the defendant, testified to the same events. There was sufficient evidence, therefore, from which the jury could have concluded that the defendant abducted the victim and restrained him with the intent to steal the victim's guns, which is a felony.

B

The defendant also was convicted of burglary in the first degree in violation of § 53a-101 (a) (2). "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone." General Statutes § 53a-101 (a).

The victim testified that upon hearing a knock at the front door of his home, he answered the door and immediately was knocked to the floor, where he was held down, and his hands and feet were bound with duct tape. Buitrago testified that it was the defendant who forced his way into the victim's home, knocking the victim down and, subsequently, taping his hands and feet. Buitrago also testified that the defendant's purpose in forcibly entering the house was to steal guns that belonged to the victim. In addition, Stanley Stasaitis, a detective with the Waterbury police department who responded to the victim's 911 call, noticed red marks on the right side of the victim's forehead and offered him medical assistance. From this evidence, the jury reasonably could have found that the defendant knowingly and unlawfully entered the victim's home, intentionally, knowingly or recklessly inflicting bodily

injury to the victim, with the intent to steal the victim's guns.

## C

The defendant was convicted of robbery in the second degree in violation of § 53a-135 (a) (1). "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present . . . ." General Statutes § 53a-135 (a). General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

The victim testified that he was knocked to the ground and held down by the individuals who forcibly had entered his home. Buitrago testified that it was the defendant who had knocked the victim to the ground, held him there and taped his hands and feet. A pillowcase was also put over the victim's head. In addition, Buitrago testified that the purpose of the forcible entry was to steal the victim's guns. Furthermore, Buitrago testified that he, Torres and Meteiver were present and assisted the defendant in committing the crime. From this evidence, the jury reasonably could have found that the defendant, assisted by other individuals actually present, used physical force against the victim in an effort to steal his guns and to prevent the victim from resisting.

## D

In addition to the previously discussed charges, the defendant also was charged with conspiracy to commit

kidnapping in the first degree in violation of §§ 53a-48 and 53a-92 (a) (2) (B), conspiracy to commit burglary in the first degree in violation of §§ 53a-48 and 53a-101 (a) (2), and conspiracy to commit robbery in the second degree in violation of §§ 53a-48 and 53a-135 (a) (1). "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." General Statutes § 53a-48. "The existence of a formal agreement between the parties need not be proved. It is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of a conspiracy, a conviction is usually based on circumstantial evidence. . . . The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as we have an agreement." (Internal quotation marks omitted.) *State v. Gonzalez*, 69 Conn. App. 649, 653, 796 A.2d 1225, cert. denied, 260 Conn. 937, 802 A.2d 91 (2002).

Buitrago testified that, while they were at McDonald's, the defendant and Meteiver had a conversation about "getting guns" from the home of Meteiver's father-in-law. After having this conversation, the four men drove to the home of Meteiver's father-in-law, forcibly entered, knocked the victim to the ground, taped his hands and feet, put a pillowcase over his head, demanded to know where the victim kept his guns, searched the home for guns and stole $150, a handgun and the victim's bank card. From this evidence, the jury reasonably could have concluded that the defendant had conspired with others to commit the crimes for which he was charged and convicted.

## II

The defendant's second claim is that the prosecutor engaged in impropriety when, during closing argument,

she argued facts that were not in evidence that "significantly infected the fairness of the trial" by appealing to the jury's emotions.[4] "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), whether the entire trial was so infected with unfairness as to deprive the defendant of his due process right to a fair trial. . . . These factors include the extent to which the misconduct was invited by defense conduct, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the effectiveness of the curative measures adopted and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Ayuso*, 105 Conn. App. 305, 320, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008).

"In determining whether [prosecutorial impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue

---

[4] The defendant correctly notes that although he did not object to the challenged statements at trial, his claim is reviewable in light of *State* v. *Fauci*, 282 Conn. 23, 33, 917 A.2d 978 (2007) ("[o]nce prosecutorial impropriety has been alleged . . . it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding*").

the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 594, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005).

The defendant argues that the prosecutor improperly appealed to the emotions of the jury by arguing facts that were not in evidence regarding the defendant's relationship with his daughter. In addition, the defendant argues that the prosecutor improperly bolstered Buitrago's credibility when she argued facts that were not in evidence regarding Buitrago's concern for the defendant's daughter and for the victim. The defendant posits that this impropriety amounted to a shifting of the burden of proof from the state to the defendant, in that the prosecutor led the jury to believe that it had to accept Buitrago's testimony as true unless the defendant proved he was not credible.

During final argument, when speaking about the defendant's relationship with his daughter, the prosecutor stated: "The defendant . . . didn't care anything about his six year old daughter. He took her to a crime scene. He took her to commit a crime. He didn't care anything about her, [and] [w]e know if [the defendant] doesn't care enough about his daughter, then, to take her to a crime such as this, he has no regard for his young nephews . . . ." Regarding Buitrago's relationship with the defendant's daughter, the prosecutor stated: "Buitrago cared about his six year old cousin. He didn't want her to be scared. He ran up to the bedroom, knew there was a gun there, a gun that the defendant . . . told [him] to put away. He goes there, he protects his cousin." And, regarding Buitrago's concern for the victim, the prosecutor stated: "But [Buitrago] still found some compassion in his heart to offer [the victim] a pillow."

During trial, the state presented evidence that the defendant took his six year old daughter with him and left her alone in the car when he committed the crimes. There was further testimony that the handgun that was taken from the victim's home was found in a drawer under the bed of the defendant's daughter. Because the prosecutor may properly ask the jury to draw reasonable inferences from the facts presented; see *State* v. *Ancona*, supra, 270 Conn. 594; it was not improper for the prosecutor to ask the jury to draw a reasonable inference that the defendant's actions demonstrated a lack of concern for his daughter's welfare.

Similarly, there was evidence that when the police knocked on the door of the defendant's apartment, Buitrago ran to where his cousin was sleeping because he thought she might be frightened. Furthermore, there was evidence that the victim told Buitrago that he had a broken hip and, in response, Buitrago placed a pillow under the victim's hip, while he lay on the floor. Again, the prosecutor properly asked the jury to draw reasonable inferences from the facts that Buitrago demonstrated concern for his cousin and concern for the victim. Because the prosecutor was arguing facts that were in evidence and was calling on the jury to draw reasonable inferences from those facts, there was no prosecutorial impropriety. See id.

Finally, the defendant argues that by asking the jury to believe Buitrago's testimony unless something occurred in the courtroom that made the jury disbelieve him, the state improperly shifted the burden of proof to the defendant. During closing arguments, the prosecutor stated, "you need to look for other reasons that were established in this courtroom of why you should not believe . . . Buitrago. It has to be established in this courtroom. It can't be something that's speculative. It can't be something that you just dream up. It has to have been established in this courtroom for . . . Buitrago to have made up this story about his uncle." In

addition, during rebuttal, the prosecutor stated, "[y]ou can't discount what . . . Buitrago says merely because the defendant tells you to," and "you can't come up with a doubt. You can't raise a doubt. Your verdict here, the evidence here, everything that you do in this courtroom is based upon the evidence that's presented in this courtroom."

The defendant argues that these comments "lead to the logical conclusion that, unless the defendant can prove his nephew lied, the jury must believe the state's witness." The prosecutor's comments to the jury did not amount to a mandate to believe Buitrago's testimony unless the defendant proved otherwise. The prosecutor merely requested that the jury believe Buitrago unless any evidence, including evidence put forward by the defendant, discredited his testimony. The prosecutor's comments, therefore, directed the jury to do exactly what it was supposed to do—weigh the credibility of the witness in accordance with all of the evidence put before it in the courtroom and not engage in speculation. See *State* v. *Ayuso*, supra, 105 Conn. App. 334. Asking the jury to believe a witness unless there is evidence to discredit the witness is a proper request and in no way shifts the burden of proving the defendant's guilt from the state to the defendant. We conclude that no prosecutorial impropriety occurred.

The judgment is affirmed.

In this opinion the other judges concurred.